**No. 26-10252**

# United States Court of Appeals for the Fifth Circuit

WEATHERFORD INDEPENDENT SCHOOL DISTRICT,
*Plaintiff-Appellee,*

v.

K.L., by next friend S.H.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Civil Action No. 4:26-cv-00108

**BRIEF OF APPELLANT**

MARK WHITBURN
TEXAS BAR NO. 24042144
WHITBURN & PEVSNER, PLLC
2000 E. LAMAR BLVD., SUITE 600
ARLINGTON, TEXAS 76016
TEL: (817) 653-4547
EMAIL: MWHITBURN@WHITBURNPEVSNER.COM

**No. 26-10252**

# United States Court of Appeals
# for the Fifth Circuit

WEATHERFORD INDEPENDENT SCHOOL DISTRICT,
*Plaintiff-Appellee,*

v.

K.L., by next friend S.H.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Civil Action No. 4:26-cv-00108

## APPELLANT'S CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. K.L.: Defendant/Appellant
2. S.H.: K.L.'s guardian
3. Weatherford Independent School District: Plaintiff/Appellee
4. Whitburn & Pevsner, PLLC: Counsel of record for Appellant
5. Leasor Crass, P.C.: Counsel of record for Appellee

__/s/ Mark Whitburn______
Mark Whitburn

## STATEMENT REGARDING ORAL ARGUMENT

Defendant/Appellant K.L., by and through his next friend, S.H., respectfully requests oral argument in this matter. The legal arguments are sufficiently complex that Defendant/Appellant respectfully submits that oral argument would assist this Court in application of relevant law.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ... i
**STATEMENT REGARDING ORAL ARGUMENT** ... iii
**TABLE OF CONTENTS** ... iv
**TABLE OF AUTHORITIES** ... vi
**JURISDICTIONAL STATEMENT** ... 1
**ISSUE PRESENTED** ... 1
**I. STATEMENT OF THE CASE** ... 1
**A. Defendant K.L. and His Disabilities** ... 1
**B. K.L.'s Escalating Behaviors at WISD** ... 2
**C. K.L.'s Forced Move Away from WISD** ... 4
**D. K.L.'s Experience in the Austin State Hospital** ... 6
**E. Calo Programs** ... 7
**F. The Administrative Due Process Proceedings and District Court Proceeding in the Western District of Texas** ... 8
**G. Proceedings in the District Court Below** ... 11
**II. SUMMARY OF THE ARGUMENT** ... 13
**III. ARGUMENT** ... 14
**A. Standard of Review** ... 14
**B. There Was a Substantial Likelihood that K.L. Would Prevail on the Merits.** ... 18
**1. The Injunction in Favor of K.L. Should Have Been Automatic Under 20 U.S.C. § 1415(j).** ... 18
**2. K.L. Was Substantially Likely to Prevail on the Merits of His ADA and Section 504 Claims as Well.** ... 21
**C. There Was a Substantial Threat that K.L. Would Suffer Irreparable Injury If the Injunction Was Not Granted.** ... 28
**D. The Threatened Harm to K.L. Outweighs Any Harm Threatened to the School District.** ... 29
**E. The Grant of a Preliminary Injunction Would Not Disserve the Public Interest.** ... 30

IV. CONCLUSION........................................................................................................31
**CERTIFICATE OF COMPLIANCE** ....................................................................32

## TABLE OF AUTHORITIES

**Cases**

*A.J.T. v. Osseo Area Sch.*,
605 U.S. 335 (2025)……………………………………………………..26, 27

*Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*,
790 F.2d 1153 (5th Cir. 1986)……………………………………………27

*Alex A. v. Edwards*,
2022 U.S. Dist. LEXIS 173012 (M.D. La. Sept. 23, 2022)……………….……..28

*Blue Bell Creameries, L.P. v. Denali Co., LLC*,
2008 U.S. Dist. LEXIS 58083 (S.D. Tex. July 31, 2008)………….……………30

*Delano-Pyle v. Victoria County*,
302 F.3d 567 (5th Cir. 2002)……………………………………………..25

*Doe v. U.S. Dep't of Homeland Sec.*,
2018 U.S. Dist. LEXIS 116901 (S.D. Tex. July 13, 2018)………………………28

*Doe v. Portland Pub. Sch.*,
30 F.4th 85 (1st Cir. 2022)……..……………………………………….20

*EEOC v. Cosmair, Inc.*,
821 F.2d 1085 (5th Cir. 1987)……………………………………………29

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
630 F.3d 1153 (9th Cir. 2011)……………………………………………30

*Florence County Sch. Dist. Four v. Carter*,
510 U.S. 7 (1993)………………………………………………………29

*Gadsby v. Grasmick*,
109 F.3d 940 (4th Cir. 1997)……………………………………………..30

*Houston Indep. Sch. Dist. v. VP*,
582 F.3d 576 (5th Cir. 2009)……………….……………………………19

*Isaac A. v. Carlson*,
775 F. Supp. 3d 1296 (N.D. Ga. 2025)……….………………………………….24

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011)…………………..…………………….…………14

*Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Parish Gov't*,
849 F.3d 615 (5th Cir. 2017)……..…………………..……………………14, 15

*Kemp v. Helder*,
610 F.3d 231 (5th Cir. 2010)……………………..…………………………25

*Lia Network v. City of Kerrville*,
163 F.4th 147 (5th Cir. 2025)……………………..………………………14

*M.R. v. Ridley Sch. Dist.*,
744 F.3d 112 (3d Cir. 2014)……………………………..…………………….20

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999)……………………………………………………23, 24, 26

*Productos Carnic, S.A. v. Central Am. Beef and Seafood Trading Co.*,
621 F.2d 683 (5th Cir. 1980)……………………..……………………………15

*R.C. v. Keller Indep. Sch. Dist.*,
958 F. Supp. 2d 718 (N.D. Tex. 2013)…………………………………………27

*Round Rock Indep. Sch. Dist. v. Amy M.*,
540 F. Supp. 3d 679 (W.D. Tex. 2021)…………………………………...…30

*S.C. v. Lincoln Cty. Sch. Dist.*,
16 F.4th 587 (9th Cir. 2021)…………………………………………………20

*Sch. Comm of Burlington v. Dep't of Educ.*,
471 U.S. 359 (1985)……………………………………………………………20

*State of Texas v. Seatrain Int'l, S.A.*,
518 F.2d 175 (5th Cir. 1975)………..……………………………………15

*Steward v. Young*,
787 F. Supp. 3d 476 (W.D. Tex. 2025)……..……………………………..29

*Susquenita Sch. Dist. v. Raelee S.*,
96 F.3d 78 (3d Cir. 1996)……………………………………………30

*Teague Indep. Sch. Dist. v. Todd L.*,
999 F.2d 127 (5th Cir. 1993)…………………………………………...24

*Tina M. v. St. Tammany Par. Sch. Bd.*,
816 F.3d 57 (5th Cir. 2016)……………………….……………………17

*Titlemax of Tex., Inc. v. City of Dallas*,
142 F.4th 322 (5th Cir. 2025)……………………….…………………15

*Wagner v. Bd. of Educ. of Montgomery Cty.*,
335 F.3d 297 (4th Cir. 2003)…………………………………...……17

*Windham v. Harris Cty.*,
875 F.3d 229 (5th Cir. 2017)……………………….…………………23

*Women's Med. Ctr. of Nw. Hou. v. Bell*,
248 F.3d 411 (5th Cir. 2001)………………………………………….14

**Statutes and Rules**

19 Tex. Admin. Code § 89.1185(o)……………………………...…*passim*

20 U.S.C. § 1412(a)(1)……….…………………………………………8

20 U.S.C.§ 1415……………….……………………………………..1

20 U.S.C. § 1415(j)………………………………………...……*passim*

28 C.F.R. § 35.130(d)……………………………………………..23

28 C.F.R. § 41.51(d)………………………………………………23

28 U.S.C. § 1292(a)(1)……………………………..………………1

28 U.S.C. § 1331………………………………………..…………1

29 C.F.R. § 1630.2(j)(3)(iii)……………………………………………………23

29 U.S.C. § 794(a)………………………………………………………...…21

34 C.F.R. § 300.518……………………………………………………19, 20, 28

34 C.F.R. § 300.518(a)...……………………………………………………19

34 C.F.R. § 300.518(d)…………………………………………………..16, 17

42 U.S.C. § 12101(a)(3)………………………………………………………..27

42 U.S.C. § 12102(1)…………………………………………………………..22

42 U.S.C. § 12102(2)(A)……………………………………………………….22

42 U.S.C. § 12102(2)(B)……………………………………………………….22

42 U.S.C. § 12131…………………………………………………………...21

42 U.S.C. § 12131(1)(A)……………………………………………………….22

42 U.S.C. § 12131(1)(B)……………………………………………………….22

42 U.S.C. § 12131(2)…………………………………………………………..22

42. U.S.C. § 12132……………………………………..…………………….21

.

## JURISDICTIONAL STATEMENT

The district court below had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff's claims and Defendant's counterclaims arise under federal law, including 20 U.S.C. § 1415. Defendant filed a timely notice of appeal on March 15, 2026. ROA.237-8. This appeal is from the denial of a preliminary injunction motion. ROA.237-8. It is thus appealable to this Court, pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED

1. Whether the District Court below erred in declining to grant Defendant's motion for preliminary injunction when injunctive relief was required under 20 U.S.C. § 1415(j) and further abused its discretion when injunctive relief was appropriate based on the decision of the administrative hearing officer below.

## I. STATEMENT OF THE CASE

### A. Defendant K.L. and His Disabilities

Defendant K.L. is a seventeen-year-old individual with disabilities. ROA.85; AR 2-3, 470.[1] He suffered from a traumatic brain injury as young child

[1] For each factual assertion in his Statement of the Case, with limited exceptions, Defendant cites two sources. First, he cites the affidavit and other evidence presented to the District Court below in support of his motion for preliminary injunction, the denial of which is the subject of this interlocutory appeal. Second, he cites the administrative record from the due process hearing, the decision in which was appealed by Plaintiff to the District Court below. While the administrative record was made available to the District Court below on March 10, 2026, three days before the District Court's March 13, 2026, denial of Defendant's

due to severe abuse. ROA.85; AR 3, 160. He has also been diagnosed with autism, oppositional defiant disorder, disruptive mood dysregulation disorder, and attention-deficit/hyperactivity disorder. ROA.85, 96; AR 3, 9, 397, 457. S.H. is K.L.'s guardian. ROA.85. K.L. has complex behavioral needs because of his disabilities. ROA.85, 96-7; AR 6-9, 829-30, 1049-53. His behaviors include property destruction, verbal and physical aggression, self-harm, elopement,[2] and noncompliance. ROA.85, 96-7; AR 6-9, 882-5.

### B. K.L.'s Escalating Behaviors at WISD

K.L. was enrolled in the Weatherford Independent School District ("WISD") from 2021 to 2024. ROA.85; AR 4-6, 829-33, 858-9, 880-1, 1131-6. WISD recognized K.L. as eligible for special education instruction and services but failed to address—and proved incapable of addressing—his disabilities appropriately. ROA.85-6; AR 11-16. For example, as early as January 2023, to address K.L.'s

---

motion for preliminary injunction (ROA.4), it was not available to the parties in time to cite to it in their briefing to the District Court, and the District Court does not cite it in its opinion. Nevertheless, Defendant cites to it here to demonstrate that the affidavit filed in support of Defendant's motion for preliminary injunction was consistent with and fairly reflected the contents of the administrative record. Defendant notes that the administrative record has not yet been uploaded into this Court's electronic record on appeal. Because of the urgency of the relevant issues, Defendant does not seek a continuance, but rather cites to the administrative record using AR cites rather than ROA cites. Defendant stands ready to file a corrected brief when the administrative record becomes available as part of the electronic record on appeal, if this Court would find such a corrected brief helpful.

[2] Elopement in this context refers to a student leaving a designated area without permission.

elopement behavior, WISD placed him in what it called a "cool down room," but locked him in this room, greatly exacerbating his frustration. ROA.86; AR 859-64, 994-6. In one instance, when WISD staff finally opened the door to the room, K.L. desperately tried to rush out. ROA.86; AR 859-64, 994-6. WISD staff were injured by this and filed assault charges against K.L., refusing to acknowledge their own role in his behavioral escalation. ROA.86; AR 859-64, 994-6.

WISD did not design or implement an appropriate Individualized Education Program ("IEP")[3] or Behavior Intervention Plan ("BIP")[4] for K.L. ROA.86; AR 11-16. Thus, K.L.'s behaviors continued to escalate, such that he had to spend time in behavioral facilities and jail. ROA.86; AR 6, 882-5. K.L.'s behaviors escalated to such a point that, by the end of February 2024, S.H. had no choice but to place him in the Meridell Achievement Center ("Meridell")—a private facility for individuals with behavioral and neurobehavioral needs. ROA.86; AR 272, 870-1. K.L. remained there until May 2, 2024. ROA.86; AR 5, 399, 897. He was forced to leave Meridell because he was not sufficiently receptive to therapy at that point and because other residents were frequently engaging in aggressive behaviors both towards one another and towards him. ROA.86; AR 5, 871.

---

[3] An IEP is a written document designed to outline the educational programing for the student at issue.
[4] A Behavior Intervention Plan is a written document designed to address behavioral issues of a special education student and is often part of the IEP.

Upon his release from Meridell, K.L. reentered WISD. ROA.86; AR 5, 399, 872. On his first day back, so unstructured was the environment that K.L. walked directly out of the front doors to the highway. ROA.86; AR 5, 399, 874-5. Law enforcement had to shut down the highway, and, in the process, K.L. began hitting and biting the teachers and school resource officer. ROA.86; AR 5, 561, 874-5. He ended up in handcuffs as he was walked back to the school, where he faced disciplinary action. ROA.86; AR 5, 874-5. When K.L. returned to school after a suspension, he almost immediately struck a staff member in front of a school resource officer. ROA.86-7; AR 5, 399, 560, 875-6. WISD at all times fully recognized that the behavior was related to K.L.'s disabilities, but it did not make the necessary adjustments to address those disabilities. ROA.87; AR 11-12, 398-400, 441. Thus, these behaviors continued to escalate. ROA.87; AR 11-12. WISD staff was and remains untrained and ill-equipped to address K.L.'s behavioral needs effectively. ROA.87. S.H. requested that WISD provide K.L. a private educational placement. ROA.87; AR 342, 431. WISD declined this request. ROA.87; AR 430.

**C. K.L.'s Forced Move Away from WISD**

At the start of the 2024–2025 school year, convinced that WISD had no intention of adjusting its approach to addressing K.L.'s needs, S.H. moved K.L. to McKinney, Texas, and enrolled him in the Melissa Independent School District

("MISD"). ROA.87; AR 880-1. K.L. received remote instruction from MISD, but MISD also could not provide K.L. the education and behavioral supports he requires. ROA.87; AR 958-9. Like WISD, MISD declined to provide K.L. a private educational placement. ROA.87. While at MISD, K.L. was in and out of juvenile detention from August 2024 to March 2025, as MISD could not put in place any programming that could address K.L.'s behavioral needs. ROA.87; AR 882-5. On August 19, 2024, K.L. began receiving instruction and services through Behavior Network in McKinney, Texas. ROA.87; AR 882-5.

However, in late August and early September K.L.'s behaviors escalated still further and took on sexualized and even more heightened aggressive dimensions. ROA.88; AR 883-5, 930-3. He engaged in severely aggressive behaviors and property destruction. ROA.88; AR 883-5, 930-3. He began issuing threats, including threatening to bring weapons. ROA.88. In early November, when he hit S.H.'s car with a bat and attempted to jump out of the car, a court entered an order for law enforcement to pick him up. ROA.88; AR 883-5. K.L. resisted and became physically aggressive with officers. ROA.88; AR 883-5. He was ultimately detained through the holidays. ROA.88. No aspect of MISD's programming had any positive effect with respect to K.L.'s behavioral needs during this time. ROA.88.

In the meantime, K.L.'s behavior continued to escalate, such that he was placed at the Juvenile Justice Center and behavioral hospitals. ROA.88; AR 883-5. In March 2025, K.L. was ultimately placed in the Austin State Hospital, a state psychiatric facility where he resided until February 20, 2026. ROA.88, 201-2; AR 1, 828-9, 888-9, 936-7, 940-1. The Texas Health and Human Services Commission operates the Austin State Hospital. ROA.88. K.L. was placed there for psychiatric treatment and not for educational purposes. AR 779.

### D. K.L.'s Experience in the Austin State Hospital

In March 2025, almost as soon as he got there, K.L. was raped by a peer at the Austin State Hospital. ROA.88; AR 2, 828-9, 888-9. This alone caused severe trauma to K.L.—a child who was traumatized long before from the severe abuse he suffered as a child. ROA.88. Moreover, he was bullied and physically assaulted by his peers as well. ROA.88; AR 2, 828-9, 888-9. During the summer of 2025, a peer entered K.L.'s room and beat him severely. ROA.88; AR 828-9, 888-9. On another occasion, other residents ganged up on K.L. and beat him, causing substantial injuries. ROA.88. On October 5, 2025, a peer attacked K.L. and inflicted severe head injuries requiring a visit to the emergency room. ROA.88. Austin State Hospital staff were ineffective in preventing these harms to K.L. ROA.88. Austin State Hospital was unable to keep K.L. safe, let alone provide him with an appropriate education. ROA.88. K.L. was at imminent risk of

continued trauma and additional physical and emotional harm if he stayed at the Austin State Hospital. ROA.88; AR 940-1.

WISD's longstanding failures to address K.L.'s behaviors and circumstances effectively led to an escalation of his behaviors and ultimately led to the disastrous and dangerous situation where he found himself. ROA.89. In fact, as K.L.'s treating physician has indicated in correspondence, K.L. "would be a danger to himself and others either in his home environment or in a traditional public school environment." ROA.89, 96-7; AR 1052-6. It is the treating physician's professional opinion that "a residential treatment placement represents the most appropriate and necessary next step for [K.L.'s] care. . . . A structured, therapeutic residential environment can provide the consistency, safety, multidisciplinary coordination, and behavioral reinforcement that are not possible in an outpatient or home-based model. Without this level of intervention, [the treating physician] believe[s] there is a substantial risk that [K.L.'s] behaviors will escalate further, potentially resulting in continued harm to himself or others and further disruption to his social and educational development." ROA.89, 96-7; AR 1052-6.

**E. Calo Programs**

The Calo Programs ("Calo") in Lake Ozark, Missouri, is a private residential placement that alone has the tools, resources, and knowledge base to address K.L.'s behavioral and educational needs in an appropriate manner and also the

willingness to do so. ROA.89; AR 12, 889-90, 937-40. Calo is an educational placement approved by the Texas Education Agency ("TEA"). ROA.89; AR 889-90, 937-40. Calo has an immediate opening for K.L. ROA.89. Calo specializes in serving students with complex behavioral needs caused by developmental trauma who fail to maintain safe behavior in school or at home. ROA.89; AR 12, 889-90, 937-40. Calo utilizes a relationship-based approach to help students learn to regulate their emotions and behavior in the classroom. ROA.89. Additionally, Calo offers a range of beneficial services to students, such as clinical therapy, neurotherapy, canine therapy, and adventure therapy. ROA.89. Calo has the tools, resources, and knowledge base to provide K.L. an appropriate education and to ensure his safety and wellbeing. ROA.90; AR 889-90, 937-40. Calo has accepted K.L. into its program, but K.L. cannot attend Calo unless a school district places him there. ROA.90. Calo is not covered by private health insurance. ROA.90. No other private placement has accepted K.L. into its program. ROA.90; AR 889-90, 937-40.

### F. The Administrative Due Process Proceedings and District Court Proceeding in the Western District of Texas

On July 8, 2025, S.H. filed an administrative complaint—called a due process complaint—with the TEA. ROA.90; AR 18-24. He claimed that WISD and MISD failed to provide K.L. with a Free Appropriate Public Education ("FAPE") in accordance with the IDEA, 20 U.S.C. § 1412(a)(1), and sought an

order compelling WISD and MISD to provide an appropriate private educational placement for K.L. at Calo at WISD's and MISD's expense. ROA.90; AR 18-24. The hearing officer bifurcated the due process complaint into two different proceedings against WISD and MISD individually. ROA.90; AR 47-8.

K.L.'s guardian filed a complaint and related motion practice in the United States District Court for the Western District of Texas in *K.L. v. Young*, Cause No. 1:25-cv-01814-RP (W.D. Tex.) on or about November 13, 2025. He was forced to commence this litigation because on or about November 7, 2025, he had received a telephone call from the Austin State Hospital indicating its intention to discharge K.L. on November 22, 2025. *See K.L. v. Young*, Cause No. 1:25-cv-01814-RP (W.D. Tex.), Original Verified Complaint (Dkt. No. 1), at ¶ 29. With these filings, K.L.'s guardian sought at a minimum to prevent the Texas Health and Human Services Commission from discharging K.L. from the Austin State Hospital before he could be placed at Calo.

The administrative due process hearing against WISD took place on December 2–3, 2025. AR 1. On January 5, 2026, the administrative hearing officer determined K.L. met his burden of proof to show that (1) WISD "violated the IDEA or denied [K.L.] a FAPE by failing to develop and implement an appropriate IEP or BIP," and (2) K.L. "was entitled to a residential placement at Calo Programs or any other appropriate, TEA-approved residential placement."

ROA.90; AR 16. The hearing officer ordered that K.L.'s "request for residential placement at Calo Programs or a comparable TEA-approved residential placement is granted for one school year or its equivalent," and that this "residential placement, including associated and necessary costs, shall be at [WISD's] expense. [WISD] shall cooperate with [K.L.] to effectuate this placement." ROA.90; AR 16.

Although WISD was required to comply with the Decision within ten school days of the issuance of the Decision (19 Tex. Admin. Code § 89.1185(o)), it simply refused to do so. In light of this refusal, the United States District Court for the Western District of Texas issued an order on January 20, 2026, requiring that the Austin State Hospital not discharge K.L. until February 20, 2026, or the issue of his placement at Calo was resolved. *See K.L. v. Young*, Cause No. 1:25-cv-01814-RP (W.D. Tex.), Dkt. No. 57; ROA.99-100. The United States District Court for the Western District of Texas expressly based this Order on representations from counsel for WISD that "Weatherford ISD intends to appeal the Hearing Officer's decision and to seek a temporary restraining order ('TRO') enjoining enforcement of the decision while such appeal is pending. Counsel further informed the Court that he intends to file said motion for a TRO in the United States District Court for the Northern District of Texas on or before

January 23, 2026." *See K.L. v. Young*, Cause No. 1:25-cv-01814-RP (W.D. Tex.), Dkt. No. 57; ROA.99-100.

### G. Proceedings in the District Court Below

Contrary to its express representations to the United States District Court for the Western District of Texas, WISD did not even file a complaint in the United States District Court for the Northern District of Texas before January 23, 2026. ROA.6-13. In fact, it only filed a complaint in the District Court below on February 2, 2026, presumably prompted by the undersigned counsel's correspondence with the TEA earlier on that same date, in which the TEA sought status clarification from WISD. ROA.6-13, 106. Furthermore, again contrary to its express representations to the United States District Court for the Western District of Texas, WISD did not file a motion for temporary restraining order with the United States District Court for the Northern District of Texas at all. ROA.2-3. Consistent with its strategy of delay, it filed only a complaint making vague reference to a motion for preliminary injunction. ROA.6-13. Consequently, K.L. had no choice but immediately to file an answer and counterclaim, along with a motion for a temporary restraining order and preliminary injunction. ROA.25-109.

In light of the briefing schedule set forth by the United States District Court for the Northern District of Texas (ROA.161), K.L.'s guardian requested that the United States District Court for the Western District of Texas extend the time in

which K.L. would remain in the Austin State Hospital, based on the fact that he would be a danger to himself and to others if released from the Austin State Hospital without a placement at Calo Programs. *See K.L. v. Young*, Cause No. 1:25-cv-01814-RP (W.D. Tex.), Dkt. No. 64. On February 18, 2026, the United States District Court for the Western District of Texas entered a text order indicating that "further orders on the placement of Plaintiff K.L. [were] appropriately within the remit of the Northern District." On that same date, K.L. filed a notice with the United States District Court for the Northern District of Texas advising that Court of K.L.'s impending discharge on February 20, 2026. ROA.201-2. K.L. was then discharged from the Austin State Hospital on that date.

On March 13, 2026, three weeks after K.L.'s discharge from the Austin State Hospital, the United States District Court for the Northern District of Texas denied K.L.'s motion for preliminary injunction based on the reasoning that K.L. had insufficiently explained in his briefing why Calo Programs is the current educational placement under 34 C.F.R. § 300.518. ROA.232. The District Court reasoned that the "current placement appears to be the [Austin State Hospital]." ROA.232. As discussed below, the District Court's reasoning was erroneous for multiple reasons, including, but not limited to, the fact that K.L. was discharged from the Austin State Hospital on February 20, 2026. ROA.201-2.

As WISD continues to refuse to comply with the Decision and the relief contained in the Decision, requiring WISD to effectuate K.L.'s placement at Calo, K.L. remains at imminent risk of additional trauma and emotional and physical harm. It is critical that K.L. obtain placement at Calo immediately. It is critical that WISD comply with the Decision by effectuating his placement at Calo immediately. As the District Court below denied K.L.'s motion for preliminary injunction to accomplish this, K.L. has had no alternative but to pursue an interlocutory appeal with this Court. As shown below, this Court should reverse the District Court's denial of K.L.'s motion for preliminary injunction.

## II. SUMMARY OF THE ARGUMENT

Defendant K.L. is entitled to a preliminary injunction because the administrative hearing officer's Decision below caused Calo Programs to become K.L.'s "then-current educational placement" for purposes of 20 U.S.C. § 1415(j) and its implementing regulations. Thus, WISD was obligated pursuant to 20 U.S.C. § 1415(j) to place him at Calo Programs during the pendency of any appeal of the Decision. Likewise, 19 Tex. Admin. Code § 89.1185(o) independently required WISD to effectuate that placement within ten days of the Decision. Furthermore, although an injunction in favor of K.L. is automatic pursuant to 20 U.S.C. § 1415(j), the traditional preliminary injunction factors militate in favor of K.L. in any event. K.L. has a substantial likelihood of succeeding on the merits of

his IDEA claims pursuant to 20 U.S.C. § 1415(j). He also has a substantial likelihood of succeeding on the merits of his Section 504 and ADA claims because WISD's failure to comply with its stay-put obligations constituted a violation of those statutes as well. The other preliminary injunction factors also favor K.L.

## III. ARGUMENT

### A. Standard of Review

The "ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, but a decision grounded in erroneous legal principles is reviewed de novo." *Lia Network v. City of Kerrville*, 163 F.4th 147, 160 (5th Cir. 2025) (quoting *Women's Med. Ctr. of Nw. Hou. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001), internal quotation marks omitted).

Under ordinary circumstances, to "obtain a preliminary injunction, a movant must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs the injury to the party to be enjoined; and (4) that granting the injunction will not disserve the public interest." *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017); *see also Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

A movant need not necessarily satisfy each of these factors to the same degree. Rather, a court must use a balancing-type approach in reviewing a motion

for preliminary injunction. *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). When analyzing the degree of "success on the merits" necessary to justify injunctive relief, the Fifth Circuit employs a sliding scale that involves balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits. *See Productos Carnic, S.A. v. Central Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980); *Titlemax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025). Indeed, a showing of even some likelihood of success will justify preliminary injunctive relief. *See, e.g.*, *Jefferson Cmty. Health Care Ctrs.*, 849 F.3d at 626 ("Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements."). In this case, as demonstrated below, K.L. met all the factors necessary for the District Court below to issue a preliminary injunction. The District Court abused its discretion with respect to the traditional preliminary injunction analysis in denying the requested preliminary injunction.

However, Defendant K.L. did not even need to satisfy the traditional criteria to obtain a preliminary injunction in this matter. Because the decision of the administrative hearing officer in the underlying administrative due process proceedings (the "Decision") requires K.L.'s placement at Calo Programs, that

placement immediately became K.L.'s stay put placement pursuant to 20 U.S.C. § 1415(j). *See* 34 C.F.R. § 300.518(d): "If the hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of paragraph (a) of this section." Paragraph (a) of that section, in turn, indicates as follows: "Except as provided in § 300.533 during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." Thus, because the Decision mandates that a change of placement to Calo is appropriate and thus, pursuant to 34 C.F.R. § 300.518(d), must be treated as an agreement between S.H. and the State that K.L. should be placed in Calo, WISD was required to effectuate that placement during the pendency of any appeal of the Decision. Furthermore, pursuant to Texas state law, compliance with the Decision should have occurred within ten school days of the issuance of the Decision. 19 Tex. Admin. Code § 89.1185(o). *See also* ROA.105.

A movant does not need to satisfy the traditional requirements for a showing of entitlement to injunctive relief under 20 U.S.C. § 1415(j). On the contrary, the

entry of such injunctive relief is automatic upon a showing of the appropriate stay put placement. *See, e.g.*, *Tina M. v. St. Tammany Par. Sch. Bd.*, 816 F.3d 57, 60 (5th Cir. 2016) ("The IDEA's stay-put provision provides in relevant part that 'during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.' 20 U.S.C. § 1415(j). 'The injunction is automatic . . . . *Wagner v. Bd. of Educ. of Montgomery Cty.*, 335 F.3d 297, 301 (4th Cir. 2003). 'It guarantees an injunction that prohibits a school board from removing the child from his or her current placement during the pendency of the proceedings.' *Id*. 'Thus, when presented with an application for section 1415(j) relief, a district court should simply determine the child's then-current educational placement and enter an order maintaining the child in that placement.'").

As discussed above, because the Decision unequivocally specifies that Calo is the appropriate placement for K.L. and because 34 C.F.R. § 300.518(d) requires that the Decision's specified placement in this regard be treated as the then-current educational placement for stay put purposes for purposes of 20 U.S.C. § 1415(j), K.L. was entitled to automatic injunctive relief to place him in Calo Programs. Pursuant to the Decision, WISD is the entity responsible for effectuating that

placement. Nevertheless, as demonstrated below, even if K.L. had to satisfy the traditional injunctive relief criteria, he would have no difficulty doing so.

## B. There Was a Substantial Likelihood that K.L. Would Prevail on the Merits.

### 1. The Injunction in Favor of K.L. Should Have Been Automatic Under 20 U.S.C. § 1415(j).

As explained above, there was a substantial likelihood that K.L. would prevail on the merits of his claims under the Individuals with Disabilities Education Act. After all, as discussed above, K.L. was entitled to an automatic injunction ordering WISD to effectuate K.L.'s placement at Calo based on 20 U.S.C. § 1415(j) and its implementing regulations.

The District Court below erred in applying 20 U.S.C. § 1415(j) to the facts before it. As an initial matter, the District Court's analysis assumed that K.L. was still in the Austin State Hospital at the time of the denial of the motion for preliminary injunction. ROA.233 ("K.L. is currently living in Austin, Texas at the Texas State Hospital.") However, K.L. was not in the Austin State Hospital at the time, having been discharged three weeks before the District Court's issuance of its denial. ROA.201-2.

Furthermore, even if K.L. had still been in the Austin State Hospital, the District Court's denial would still have been erroneous. First, the Austin State Hospital is not an educational placement at all. It is an acute psychiatric facility.

AR 779. K.L. was there to obtain hospital and nursing services only until his discharge. AR 779-80.

Moreover, the District Court appears to have misunderstood the impact of 34 C.F.R. § 300.518, viewing that regulation as "nullify[ing] the stay put obligation." ROA.233. The District Court derived this understanding from the language of 34 C.F.R. § 300.518(a), which indicates that "during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." ROA.233. The District Court appears to have interpreted this language as signifying that, when the State and the parents of the child agree otherwise, the stay put obligation disappears. However, as discussed above, the language of 34 C.F.R. § 300.518(a) does not nullify stay put obligations. On the contrary, where the parents and the State agree on an appropriate placement, that placement then becomes the "current educational placement" for purposes of stay put. *See, e.g.*, *Houston Indep. Sch. Dist. v. VP*, 582 F.3d 576, 591-5 (5th Cir. 2009) ("The Supreme Court held that an administrative decision in favor of parents who had placed their child in a private school after they rejected a proposed IEP constitutes an agreement by the state to the change of the child's placement, making the new, private school placement the

current educational placement of the child.") (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 371-2 (1985)); *Doe v. Portland Pub. Sch.*, 30 F.4th 85, 91 (1st Cir. 2022) ("An administrative decision in favor of a unilateral change of placement to private school by parents can constitute 'agreement' by the state to that placement for purposes of the stay-put provision.") (citations omitted); *S.C. v. Lincoln Cty. Sch. Dist.*, 16 F.4th 587, 589 (9th Cir. 2021) ("[W]hile stay put most commonly involves maintaining the status quo, where a parent prevails in an administrative hearing and an administrative ruling agrees with the parent that a different placement is appropriate, then, as noted, it is that new placement that must be made and maintained for purposes of the stay put provision.") (citations omitted); *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 119 (3d Cir. 2014) ("Accordingly, an administrative ruling validating the parents' decision to move their child from an IEP-specified public school to a private school will, in essence, make the child's enrollment at the private school her 'then-current educational placement' for purposes of the stay-put rule. Having been endorsed by the State, the move to private school is no longer the parents' unilateral action, and the child is entitled to 'stay put' at the private school for the duration of the dispute resolution proceedings.") (citations omitted)).

It is precisely to effectuate the mandate of 34 C.F.R. § 300.518 that the Texas Legislature enacted 19 Tex. Admin. Code § 89.1185(o)), which indicates

that "[a] public education agency must implement any decision of the hearing officer that is, at least in part, adverse to the public education agency within the timeframe prescribed by the hearing officer or, if there is no timeframe prescribed by the hearing officer, within ten school days after the date the decision was rendered." WISD has violated both statutory provisions.

### 2. K.L. Was Substantially Likely to Prevail on the Merits of His ADA and Section 504 Claims as Well.

K.L. was substantially likely to have prevailed on the merits in this matter under his ADA and Section 504 claims as well, as the evidence demonstrates that the failures of WISD to provide K.L. a safe environment and reasonable accommodations by approving a private educational placement for him constitute discrimination under Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

Pursuant to Title II, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42. U.S.C. § 12132. Title II defines a "qualified individual with a disability" in relevant part as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services

or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

As an initial matter, WISD constitutes a public entity for purposes of the statute, as such entities include "any State or local government," 42 U.S.C. § 12131(1)(A), and "any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1)(B).

Additionally, K.L. qualifies as an individual with a disability under the ADA. The definition of "disability" under the ADA is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(1). The ADA has an expansive conception of "major life activities," including within the scope of that term, without limitation, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Moreover, under the ADA, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C.

§ 12102(2)(B). K.L.'s autism alone qualifies him as an individual with disability. *See, e.g.*, 29 C.F.R. § 1630.2(j)(3)(iii) ("[A]utism substantially limits brain function[.]").

Furthermore, WISD has unlawfully discriminated against K.L. by (1) failing to address his behaviors appropriately, such that they escalated to the point at which he required care at the Austin State Hospital, and (2) failing to implement the Decision and by thus forcing him to remain in the Austin State Hospital when he requires placement at Calo. Under Title II of the ADA, "a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination . . . ." *Windham v. Harris Cty.*, 875 F.3d 229, 235-36 (5th Cir. 2017) (citing cases). In the context of the determination of the placement of an individual with disabilities, public entities are required to administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities and to make whatever accommodations are reasonable and necessary to accomplish this goal. 28 C.F.R. § 35.130(d) (implementing Title II of the ADA); 28 C.F.R. § 41.51(d) (implementing Section 504).

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), the Supreme Court set out three elements that a plaintiff must establish to prove a discrimination claim based on placement in a placement other than the most integrated setting

appropriate to the needs of a qualified individual with disabilities: "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] [][5] treatment professionals have determined that [the more integrated] placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." When applied to this case, the principles of *Olmstead* demonstrate that placement in a residential treatment facility such as Calo is a reasonable and necessary accommodation.

Here, the Austin State Hospital setting was the most restrictive setting. *See, e.g.*, *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 130, 132 (5th Cir. 1993). As explained in Section I above, K.L.'s treating physician has determined that a more integrated setting in a residential treatment center is appropriate and necessary. K.L. seeks the transfer from institutional care to the less restrictive setting in a residential treatment center as evidenced by the current litigation. Although he does not seek full community integration as did the plaintiffs in

[5] Although *Olmstead* references "State treatment professionals," this is because the treatment professionals in that matter were exclusively State employees. Here, that is not the case. That fact in no way diminishes the applicability of *Olmstead*. *See, e.g.*, *Isaac A. v. Carlson*, 775 F. Supp. 3d 1296, 1345 (N.D. Ga. 2025) (citing cases).

*Olmstead*, as he would be a danger to himself and others in the community (*see* Section I above), he seeks educational instruction, services, and treatment in a more integrated setting than he is in now. Finally, the placement could be reasonably accommodated. In fact, K.L. could not reasonably have remained in the Austin State Hospital, where he has been raped and severely beaten. Furthermore, by the time of the District Court's denial of the motion for preliminary injunction, K.L. had been discharged from the Austin State Hospital in any event. ROA.201-2.

K.L. could not enter the community or the traditional public school environment, as he would be a danger to himself and others. The only reasonable placement for him was and is a residential treatment center in which he can learn in a structured environment that can help him get control over his behaviors while he gradually transitions into the community, while keeping him safe at the same time. The fact that the accommodation K.L. requests—placement at Calo—is reasonable is conclusively established by the fact that the hearing officer ordered WISD to effectuate such placement in the Decision.

K.L. was thus substantially likely to prevail on his claims under Title II of the ADA. Consequently, he is substantially likely to prevail on his claims under Section 504 as well. *See, e.g.*, *Kemp v. Helder*, 610 F.3d 231, 234 (5th Cir. 2010) ("The RA and the ADA are judged under the same legal standards, and the same

remedies are available under both Acts."); *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002) (stating that the language in the ADA generally tracks the language in the RA, and jurisprudence interpreting either section is applicable to both).

The United States recently held that ADA and Section 504 claims do not require a showing of intentional discrimination in circumstances such as these. *See A.J.T. v. Osseo Area Sch.*, 605 U.S. 335, 345 (2025) ("We hold today that ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts.") The Court further noted that "[o]utside the context of elementary and secondary education, the Eighth Circuit—in line with the general approach of the courts of appeals—permits plaintiffs to establish a statutory violation and obtain injunctive relief under the ADA and Rehabilitation Act without proving intent to discriminate." *Id.*, at 344. *See also, e.g.*, *Olmstead*, 527 U.S. at 598-99 ("We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA. . . . Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination, *see* 42 U.S.C. § 12132; additionally, in findings applicable to the entire statute, Congress explicitly identified unjust 'segregation' of persons with disabilities as a 'form of discrimination.' *See* § 12101(a)(2) . . . .") Those Congressional findings

also identified discrimination in education as a pervasive problem as well. *See* 42 U.S.C. § 12101(a)(3).

In *A.J.T.*, the Supreme Court recognized that a school district's refusal to provide the plaintiff evening instruction could constitute discrimination for purposes of the ADA and Section 504. Here, K.L. alleges that WISD's refusal to implement the Decision and to provide him private educational placement constitutes such discrimination, in part because it is impossible for him to receive a Free Appropriate Public Education in the traditional public school environment. *See, e.g.*, *R.C. v. Keller Indep. Sch. Dist.*, 958 F. Supp. 2d 718, 737 (N.D. Tex. 2013) ("If a suitable public educational placement is not available for a disabled child within a state or local school district, the district must pay the costs of sending the child to an appropriate private institution.") (citing *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir. 1986)). Here, it was clear early on that WISD could not serve K.L. Nevertheless, it refused to pay the costs of sending K.L. to an appropriate private institution. It continues to do so even when ordered to do so by the hearing officer in the Decision. Under *A.J.T.* that constitutes discrimination.

The District Court below abused its discretion in holding otherwise. The District Court simply indicated that WISD "seeking review of the Hearing Decision, which it contends is erroneous, does not establish discriminatory

behavior." ROA.235. However, Defendant does not suggest otherwise. Defendant does not argue that the act of seeking review of the Decision gives rise to a claim under Section 504 or the ADA. Rather, it is WISD's act of refusing to comply with its stay-put obligations under 20 U.S.C. § 1415(j) and 34 C.F.R. § 300.518 and with 19 Tex. Admin. Code § 89.1185(o) that give rise to these claims.

### C. There Was a Substantial Threat that K.L. Would Suffer Irreparable Injury If the Injunction Was Not Granted.

The evidence demonstrated that K.L. would suffer irreparable injury if the District Court did not grant the preliminary injunction he requested. As explained in Section I above, without the preliminary injunction, K.L. would have been at imminent risk of continued bullying, physical assault, and rape at the hands of his peers, if he had not been discharged from the Austin State Hospital on February 20, 2026. Given the fact that he was discharged from the Austin State Hospital on February 20, 2026 (ROA.201-2), he is now experiencing the reality of having nowhere to go at all. Furthermore, he will continue to lack access to a Free Appropriate Public Education in the placement ordered by the hearing officer in the Decision. This substantial likelihood of continued trauma and emotional and physical harm constitutes irreparable injury. *Doe v. U.S. Dep't of Homeland Sec.*, 2018 U.S. Dist. LEXIS 116901, at *2 (S.D. Tex. July 13, 2018) (finding irreparable injury where a plaintiff was at risk of imminent physical harm); *Alex A.*

*v. Edwards*, 2022 U.S. Dist. LEXIS 173012, at *74–75 (M.D. La. Sept. 23, 2022) (2022 WL 4445499) (finding irreparable injury from a transfer of youth in state custody to a placement that would cause deleterious psychological ramifications for the youth); *see also Steward v. Young*, 787 F. Supp. 3d 476, 765-768 (W.D. Tex. 2025) (finding irreparable injury where plaintiffs with disabilities did not receive services necessary and critical to their physical and mental wellbeing).

Furthermore, "when a civil rights statute is violated, irreparable injury should be presumed from the very fact that the statute has been violated." *EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1090 (5th Cir. 1987).

### D. The Threatened Harm to K.L. Outweighs Any Harm Threatened to the School District.

Getting K.L. into the safe educational environment of Calo Programs—the only educational facility that will accept him—far outweighs any conceivable harm to WISD that could arise from the preliminary injunction K.L. requests.

While WISD complained to the District Court that compliance with its stay-put obligations would require a significant expenditure of resources, the United States Supreme Court has expressly excluded cost as a factor in circumstances such as these. In *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993), the Court explained as follows:

> The school district also claims that allowing reimbursement for parents such as Shannon's puts an unreasonable burden on financially strapped local educational authorities. The school district argues that requiring parents to

> choose a state-approved private school if they want reimbursement is the only meaningful way to allow States to control costs; otherwise States will have to reimburse dissatisfied parents for any private school that provides an education that is proper under the Act, no matter how expensive it may be. There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*See also Round Rock Indep. Sch. Dist. v. Amy M.*, 540 F. Supp. 3d 679, 703-4 (W.D. Tex. 2021) (rejecting financial burden to the school district as a basis for staying the administrative hearing officer's decision to award private placement and quoting *Carter*); *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 87 (3d Cir. 1996) (rejecting financial burden argument and quoting *Carter*); *Gadsby v. Grasmick*, 109 F.3d 940, 951 (4th Cir. 1997) (rejecting financial burden argument and quoting *Carter*).

### E. The Grant of a Preliminary Injunction Would Not Disserve the Public Interest.

The grant of the preliminary injunction requested by K.L. would serve the public interest. Courts have held that "the public interest is served whenever state and federal laws are enforced." *See, e.g.*, *Blue Bell Creameries, L.P. v. Denali Co., LLC*, 2008 U.S. Dist. LEXIS 58083, at *20-21 (S.D. Tex. July 31, 2008) (collecting cases). *See also Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d

1153, 1167 (9th Cir. 2011) ("In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities.") The granting of a preliminary injunction will not disserve the public interest.

## IV. CONCLUSION

In light of the foregoing, Defendant K.L. respectfully requests that this Court reverse the District Court's denial of his motion for preliminary injunction.

DATED: June 3, 2026

Respectfully submitted,

/s/ Mark Whitburn

Mark Whitburn
Texas Bar No. 24042144
Sean Pevsner
Texas Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Telephone: (817) 653-4547
Facsimile: (817) 653-4477
mwhitburn@whitburnpevsner.com

ATTORNEYS FOR DEFENDANT-APPELLANT

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on June 3, 2026, by electronic filing service on the counsel of record as follows:

Grant N. Moore
Leasor Crass, P.C.
302 W. Broad Street
Mansfield, Texas 76063

/s/_Mark Whitburn___________
Mark Whitburn

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,373 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been pre-pared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Mark Whitburn*
Mark Whitburn